in numbers 23,935 and 23,1004. Broadcast Music, Inc. v. North American Concert Promoters. Good morning, your honors. May it please the court, Andy Gass from Latham & Watkins on behalf of Appellant North American Concert Promoters Association. The district court here committed two errors that warrant vacature and reversal primarily. The first is that the result reached was substantively unreasonable in that no cogent analysis could yield the result that the district court embraced. The second is that even if you're not prepared to say that this result was not among the range of plausible outcomes, the result was altogether unexplained. With respect to the first issue, the substantive unreasonableness. We're dealing here with an industry where there's a set of essential inputs that are divided essentially among four sellers. You've got two that control, for simplicity's sake, call it 45, 46%, and two smaller ones that control 3 to 5% each. How much of the market does your association represent? It depends what market you're referring to, your honor. With respect to the market of the licenses that BMI sells in the aggregate, the answer is less than 1%. With respect to the market for concert promotion in general, that's not a fact that's in the record in this case. Okay. So you're trying to price one of the 46% slices. There are two logical ways to do that. The first would be by reference to what the other seller of the 46% slice sold during the relevant period. In this case, there's overwhelming reason to do that because they're similarly situated in a number of respects. ASCAP is the other seller. That was a negotiated price. That wasn't a judicially ordered price. Precisely, your honor. Precisely. And covering four of the five years at issue here in the main rate period. The other logical way that one might do this would be to look at the prior deal with the seller of the 46% that we're trying to price here. Either of those approaches would yield an answer roughly half. Can I ask, I mean, you say there are two logical ways to do it. If the question that we're trying to answer, and it's framed, I find it puzzling the way it's framed in the cases is what would an arm's length transaction deal outside of this context. But an arm's length transaction would yield whatever would happen without this consent decree at all, right? So really what's happening is we've determined that the monopoly power from aggregating all these rights creates an undesirable policy outcome that we want to mitigate by court intervention. What is the principle that the court is supposed to apply in deciding how much to mitigate the natural outcome of BMI's monopoly market power from the aggregation? Let me answer that last question directly, and then I want to circle back to the first part of it. So the principle that you should embrace is that the purpose of the consent decrees is precisely to give you a rough proxy for what a competitive transaction would look like in this industry. It's not always going to be the case that a deal done by ASCAP or BMI is going to have been protected from the exercise of market power by the consent decree. But much of the time, the idea is the very presence of those consent decrees is going to tend to yield a result that's closer to what would emerge in an effectively competitive market. But let me just say, I think Judge Coates' articulation of the standard and the one that Judge Stanton articulated in his opinion is actually a little more apt than the way that Your Honor put it. Because the question is, what is the price that would emerge between a willing buyer and a willing seller under conditions of effective competition? That's what we're trying to answer, not simply if we didn't have the consent decree, what would happen. So, but here's my challenge with that. There are two components of sort of the monopolistic aspect of this. One is the exclusive rights that the creators have to their content. That's not a problem. Congress has said, we like that monopoly. We want them to have that. We want them to be able to- Agree entirely, Your Honor. The second is the monopoly power that comes from aggregating lots and lots and lots of these. So, that's something that we think is a problem. We want to mitigate the power that comes from that. Why wouldn't the solution to figuring out, okay, what's the market consequence of that aggregation be to look at the prices that the much smaller players in the market who aren't subject to a consent decree can extract from a willing buyer for the monopolistic rights to a much smaller set of interests? Why isn't that actually the best benchmark for what we're trying to do? There are two reasons, Your Honor. The first is that there are a number of other considerations that make using small sellers like those really inept benchmarks. The volatility, the fact that there are potentially other circumstances at issue, the idea that buyers may well overpay for a smaller dollar amount of rights. The district court said there was no evidence in this case that that was true in Note 7 at 33. That was clear error. Appendix page 377 is actually a colloquy between the judge and NACPA witness in which the judge cut him off because he said that's already in the record. But regardless, so point one, there's a bunch of other reasons why these benchmarks are very dangerous. I'd like to circle back to the volatility point in a moment because it's very important to understand. Point two, you are absolutely right. What we are interested in solving for is the incremental market power that results from the aggregation of rights into what is effectively a must-have asset by the buyer. If it's just one, then we don't worry about it so much. Maybe if it's one, and as the Supreme Court held, it's the non-exclusive path to get a license. You also don't worry about it. Here, what we're dealing with with even the smaller PROs is that they, too, have aggregated copyrights together into an effectively must-have bundle, and there's no way to be confident that that also doesn't yield precisely the incremental market power from aggregation that the consent decrees are intended to protect. But they're different, right? So it's not the same market power, right? The rates are different. The implied rates are significantly higher on the market menu. You're saying the rates aren't really that different when you look at the actual rate because it's a tiny fraction, and when we look at the implied rates, we're multiplying it as if it's a big entity, but that's not necessarily what it would look like if it was as big an entity. Is that your position? That's among the things that I'm saying. But again, I want to circle back to the question of how you actually go about the task of extrapolating from the small rates to a larger implied rate. So here, just to be clear, all we have from CSAC and GMR, the two smaller PROs, are the amounts that various people paid them, right? We don't know what the buyers understood they were going to be getting in terms of usage with those deals. So in order to get an implied rate, in order to translate, for example, one of these global music rights deals or one of the CSAC deals to something that would even arithmetically approximate what you would get for a BMI deal, you need to say, okay, let's figure out you paid X, it turned out to be for usage Y, BMI has 10X that usage, so I'm going to multiply the price by 10. That's the exercise here. The problem with these small PROs is that understanding exactly what the usage was is very difficult to do. The record in this case, for example, is that while Judge Stanton found that GMR had 4.5% and CSAC 3.6%, GMR had told AEG, one of the concert promoters who bought the GMR license, that GMR was buying 15%. GMR told Live Nation that it was buying 12 to 15%. So from the willing buyer's perspective in that transaction, if those dollars went for a 12 or 15% share, the implied GMR rate comes down below what the BMI and ASCAP rates were. Does it really matter what the percentage of the songs is if you're saying that the way this works is that all the concert promoters just think that they all must have licenses and they're going to buy them from each licensor? It matters very much in terms of the price because that is sort of classically how the PROs have calculated roughly what the rate is that you're supposed to pay. So I need this to be reduced to a little bit more of a layperson's term because this is all kind of operating at about 75,000 feet and I'd like to get down to about somewhere around six and a half feet. So these percentages are, so I'm a concert producer in Rochester, New York. I pay a percentage to all of the PROs. Yeah, here's how this works. You're a concert promoter in Rochester, New York. I have the Finger Lakes Performing Arts Center in Canandaigua Lake. It does a great business. Constellation Wines sponsors it, so a lot of great performers come in there. If you could get me a backstage pass, I'd appreciate it. I'll work on it. I'll throw in extra parking if you give me a good answer. So let's start from the beginning. You're putting on the show. You've guaranteed a lump sum of money to your artist. If the show is profitable, the artist is going to take 90% of the door, the face value of the ticket. You're going to take 10%. From those profits, we're going to deduct out PRO fees across the board. You need to have a license from ASCAP, BMI, GMR, and CSAC because you don't know what the performer is going to play. So you buy a blanket license, and by covering those four, you've covered the field. You've covered the waterfront. So now your artist has freedom to operate. They can contribute to the vibrant cultural of musical expression that we have in this country by virtue of this system. But what are the numbers that you pay to GMR and ASCAP? Well, for ASCAP during the relevant period, you paid either 0.23% of your ticket revenues or 0.275% of your ticket revenues. To GMR, you paid a number that was sort of much lower. It ranged from 0.06% up to 0.15% depending on the size of the venue. For CSAC, you paid a number that was like 0.03 something. So when you're pricing one of the big licenses, the ASCAP or BMI license, by reference to one of the small licenses, everyone agrees that the fact that the nominal dollar amounts for GMR and CSAC are lower doesn't by itself mean that that's how the benchmark would work for ASCAP and BMI. Everyone agrees if you're going to extrapolate from those, you need to say you're covering a really small fraction of the rights at issue, so we need to sort of give it some multiplier that will more closely resemble something of the magnitude that ASCAP and BMI are selling. The volatility problem that I'm describing for you, which honestly is a sufficient basis to resolve all of this, is simply that figuring out what volume of commerce is reflected by these small PROs is really difficult. GMR has a tiny slice of the artists that BMI and ASCAP have. If the Eagles happen to go on tour one year, that's going to radically inflate their share in this sense and thus distort the multiplier. They're not really like a must-have that you just always buy, that the attractiveness of their catalog varies depending on the concerts that are happening. No, Your Honor. If the Eagles go on tour, then they have a more attractive product. Then the usage of the blanket license that you've bought is going to be higher. More of the songs that are played are going to be covered by that. But this is an essential fact of this industry. Because the concert promoters don't know what songs their artists are going to play, they effectively have no choice but to take a license from each of the four PROs. Let me poke at that a little bit. BMI under the consent decree has to sell. Promoters don't have to buy. There are alternatives for promoters. One of the questions I have is if the Eagles are going on tour, I'm going to an Eagles concert, thank you for choosing something that I can relate to generally. I'm not expecting to hear Fleetwood Mac music. So why can't the promoters simply say to the Eagles, hey, you know what? Stick to your own songbook because we don't have to pay anybody for those rights. Why can't it say to the venue, hey, in the before times when you're playing music, just what people are coming in, here, we've gone to the cheapest people, and here's the songbook you can use. Play that and nothing else. I don't understand why that would be so hard. Two points, Your Honor. First, it's simply not how the industry works. Promoters don't tell artists what songs they can play. Artists have the freedom to decide what songs they want to play. Second, in your example – Well, just a small point. If the licensors were not required to sell licenses, just refused to sell a license, you'd have to tell the artists, like we don't have a license for those songs, right? You're just saying that doesn't happen. This doesn't happen, right? Instead, and what Global Music Rights does is they'll say, listen, we are the exclusive channel through which a license can be bought to get a public performance license for The Eagles. Now, I would agree with you that if The Eagles get up and play their own songs, that's not a copyright infringement at all and no license is required. I don't know that the PROs actually agree with that. So if you indulge their premise, then absolutely, there is no way to have The Eagles go on tour except to take that license from GMR. The finding in the district court's opinion that if GMR or CSAC held out for too much money, the promoters could simply do a direct deal with some copyright owner or a music publisher or something, that is manifestly false. Again, there was consensus that the GMR licenses in particular are exclusive. And even to imagine how this would have to work economically for CSAC. So you have a CSAC deal in place, right? Because you don't know, again, just how the industry works. You don't know whether your artist is going to play an Adele song or a song by someone else who is covered by CSAC. CSAC is asking for a lot of money. So I say, what do I want to do? I want to do some direct deal, not with the intermediary CSAC, but with someone who owns the copyright in the underlying work. In order for that to be economically viable, CSAC has to give me some kind of a discount, right? Off of my license that I have with them. Otherwise, I'm playing twice for that same song. There is no evidence in the record that CSAC is ever willing to do that, and ample evidence that GMR simply refuses to, has exclusive rights. I see I'm well over time. I want to go back. In terms of this description about that's the way the industry works, it feels circular to me. If, in fact, the industry practices have been solidified in a world in which the prices are artificially suppressed for these licenses, it's a hypothetical, I know you don't think it's artificial, but that's the theory, right? If we got rid of the consent decree, I'm assuming you don't want to get rid of the consent decree. You like to have the court involvement. The presumption is that the prices would pop up. And so I'm just trying to figure out if the reason that's the industry practice is that the convenience and the security of getting these blanket licenses is cheap enough, that it's not worth exploring alternatives, then that doesn't necessarily answer the question of whether the prices that are being charged customarily are actually reflective of any sort of market value. Here's how I would answer that, Your Honor. There is no evidence in the record that it would be anything other than extremely administratively burdensome, at best, to forego a GMR and CSAC license. Mr. Marciano, in testimony that I suspect Mr. Edelman will cite to you, said, maybe I could do it. He's AEG's executive. Maybe I could do it. It would be very administratively burdensome. That's the totality of the record in this case. To conclude that these are more apt benchmarks because hypothetically someone could maybe go out if they felt like they were really being held over a barrel and not take a license is simply incompatible with how the industry works and what the record shows in this case. Another reason why it might not be an apt benchmark is the whole premise of the consent decrees is that the licensor shouldn't have a right to walk away, right? Correct. So it's not obvious. I mean, I guess you'd say, well, if it's a small seller, it looks like one that would have the right to walk away, but then we blow up the percentage that they're charging as if it was one that has enough volume that you wouldn't be able to walk away, right? That's the kind of thing we're trying to correct for. Precisely. That inability to walk away is what we'd call a feature, not a bug, of the system. If the must-have nature of these licenses comes from the legitimate monopoly of the license owner's right to extract rents for the use of its financial property, then even a 1% license would be a must-have. But it doesn't, Your Honor. It comes from the aggregation, right? No one is contending that a given individual artist owns the kind of market power that we sort of need to correct for in this rate-setting process. How much aggregation do you need before it becomes must-have and the court needs to intervene to sort of protect the promoters from it? Right. Enough that in practice the promoter has no choice but to do a deal given the administrative burdens and commercial realities otherwise. But let me just make one more point here. So we have the GMR licenses which we've been talking about, which are at the .54 rate, which is above the .5 that this report set. The only other benchmark here that is even in the neighborhood of what the district court set is this deal between CSAC and promoters other than NACPO. These are like a form license. There was no evidence in the record of who signed it, how many people. It's essentially just a rate card. Certainly no evidence of any negotiation or anything like that. Can I ask about the revenue base? Yes. So you have these arguments about whether buying VIP suites and whatever is really paying for the music or not, but isn't there a more fundamental problem here? I mean we understand that when two parties have whatever fixed bargaining power and they go in to negotiate a contract, they're going to try to increase the size of the surplus so that they're going to divide it amongst themselves. We know that it's irrational for them to agree on something that will decrease the size of the surplus. And isn't that what's happened here that actually requiring NACPO to go back and calculate the revenue base in this kind of complicated way imposes a dead weight loss because it's a whole bunch of costs without a corresponding value, and you could always increase the revenue by having a greater percentage of the ticket sales, right? I couldn't have said it better myself, Your Honor. Every single transaction in the history of this industry that has done a percentage of revenue license has done it on the basis of gross ticket revenue, not these other categories. So is there a position that's something that we could latch on to about whether it's reasonable or not reasonable that actually the expansion of the revenue base is economically irrational? Absolutely. It's economically irrational. It's economically impracticable. It's inconsistent. Now the other side says this thing about playing a revenue shell game and that's why they need to expand the revenue base. Now I guess in this case because it's retrospective, we're looking in the past like there hasn't been a revenue shell game that would prevent you from recovering the difference by increasing the percentage of the ticket sales, so maybe it doesn't apply here. But going forward, how would you account for that? Maybe you'd have some kind of condition on it. I assume you can't increase the ticketing fees so high that all the revenue would come from that and there wouldn't be enough revenue to recover on the face of the ticket, right? Of course, and these are fundamentally different businesses regardless, and many entrepreneurs don't even have one. You're – yeah, and by the way, with respect to that danger, I mean that would have the effect of taking money that would go to artists, which is the show pot, the fees, the face value of the ticket, and shunting it over to a bucket of revenue, the ticketing company, that the artist would never see a dime of. If you think the artist managers would stand for that for a second, I've got a swamp in Florida. You're saying there are other reasons why you might not do that, and I guess your district court didn't make findings about the revenue shell game, and so if that's really the reason for expanding the revenue base, we'd have to make those findings. I guess I have a separate question about that, which is if, in fact, you had a contract about licensing fees and the fees were based on the face value of the ticket and then the counterparty started moving all of their profits to the ticketing fees, would that be a violation of the implied covenant of good faith and fairness? Absolutely it could be, and I'll just remind you, Your Honor, that during the period where we're trying to price this license, ASCAP, not an unsophisticated party, entered a deal for this precise revenue base. So if there had been some history of this happening, they probably would have known about it. And then the other thing that comes up is the idea that there's consolidation in the concert industry. Is that a change in the market that would justify a change in approach to setting the rates? Certainly not. I mean the consolidation largely happened in the 2005 to 2006 era when Clear Channel sold off Live Nation and Live Nation went around acquiring concert promoters. So actually the consolidation happened before you had the negotiated rate in 2018. Exactly. But also it does kind of strike me that if you have consolidation in the concert industry, then the concert promoters should have more bargaining power, which would lead to lower rates, right? Exactly. But you don't see that. Okay. Thank you very much, Mr. Gasser, for your time for rebuttal. But let's turn to the appellee, Mr. Edelman. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Scott Edelman on behalf of BMI. Your Honors, we're here because there's a consent decree, an agreement between the United States and BMI, that provides that rates for songwriters, as represented by APRO-BMI, are determined by a district court judge in this district based on all of the evidence presented at trial. This is an inherently fact-based determination to come up with a fee that is reasonable. Here, Judge Stanton I don't expect to go into it, but we've articulated standards about how the rate should be set and what's an appropriate benchmark and so on. I mean, those are legal questions, right? Yes, Your Honor. And Judge Stanton applied the four-factor test. And what's being disputed here are a bunch of the factual determinations that were made along the way. We heard about volatility, which Judge Stanton found against them. And ultimately, Judge Stanton was tasked with making a determination between two competing experts about the competitiveness of the market and whether or not to accept the GMR and CSAC benchmarks. Professor Cutler testified for us at length. Professor Jaffe testified for the other side. And Judge Stanton made a determination, which this Court made clear in Showtime 2, in the context of a rate court proceeding, quote, The competitiveness of a market and the market power of a seller may be ascertained with the aid of expert opinions whose persuasive force is itself a factual matter within the purview of the fact finder. So are you giving the ultimate conclusion as a factual question or just the evidentiary input? So, Your Honor, the way Your Honor articulated the GMR and CSAC benchmarks, and I understood the rhetoric of your question to suggest why aren't those good benchmarks, is precisely the way Professor Cutler explained why those are superior benchmarks, because those are benchmarks that reflect a competitive dynamic as opposed to the BMI and ASCAP benchmarks. So what do we do with the fact that the district court didn't say any of those things, right? The district court said, okay, we've got good benchmarks as low as 0.21 percent and as high as 0.54 percent, and then it says, because live concerts are music-intensive, and it doesn't even specifically reference the specific evidence, but what I gather the court meant was streaming services and things like that, which use those licenses intensively, pay more. Since it's music-intensive, we're going to push the needle more in that direction. That's basically the extent of the reasoning that I gathered from the court's ultimate decision. Your Honor, I think there's more, and let me walk through what I think the court's reasoning was and what's in the opinion. But first, to get directly to your question, the determination of whether the GMR and CSAC benchmarks arose in a sufficiently competitive market, yes. Under Showtime, that is a factual determination to be made based on the expert testimony, and for us to have 15 minutes of argument between counsel as a substitute for determining the competitive nature of the market is not a basis to substitute this court's judgment for Judge Stanton, who sat and heard the evidence. I take it for granted that it's a competitive market if I treat that as a fact-finding, or I don't think about the volatility question. Isn't it right that the deals with GMR and CSAC are for a tiny catalog, and so they're actually quite small percentages? But then to make them comparable, we blow them up as if GMR and CSAC had as big a catalog as BMI, right? Yes, Your Honor. So what we're actually doing is imagining a licensor that has as big a catalog as BMI, but that has the right to walk away, right? But isn't the whole premise of the consent decree that they should not have that right to walk away? No, Your Honor. Yes, the consent decree provides that they don't have the right to walk away, but the consent decree is intended under this Court's decisions and the lower court decisions to figure out what would the rate be if you had a willing buyer and a willing seller. The inquiry of Judge Stanton, and this has been the case in all the rate courts, is not to figure out— we don't mean a willing monopolist, right? We're trying to correct for the monopolistic power of BMI and ASCAP. And what Judge Stanton said is we're trying to figure out what would monopolists, because people who have copyrights are monopolists, what would monopolists— Well, yes, okay, but here we have the added problem of the attribution. It's not just a license to— But it's not having the monopoly. It's having the excessive aggregation that comes from being BMI or ASCAP. They're at 45 percent. But we're totally correct for that, which is why we have all these cases that say that the role of the rate court is to prevent ASCAP and BMI from extracting too high a rate. But, Your Honors, what—see, we have a but-for world. If we didn't have PROs, then a music user, Canandaiga, for instance, would be required to negotiate directly with the songwriter or the publishers. And what Judge Stanton held, and it's in his opinion, based on the testimony of Professor Tucker, is that you weren't dealing with PROs. If they didn't exist, you would be dealing with publishers. And publishers have legal aggregation that gives them up to 20 percent of the market. And so what Judge Stanton reasoned, based on the evidence presented by Professor Tucker, is why should I not follow these benchmarks of a willing seller who has the right to walk away when that benchmark—when those people have less aggregation rights than the publishers that these—Canandaiga would be facing if they had to negotiate in the world without PROs. But the rate that he's comparing is not the rate that was actually achieved based on their lower—the smaller catalog. We multiply it up to compare it to the huge one, right? So actually it's a kind of artificial rate. Well, it's not artificial. We're figuring out what is the percentage share that they have and then multiplying it across. And by the way, again— The ones that look like this? Look like BMI and ASCAP? Yes. Well, the problem with BMI and ASCAP is if you—and, Judge, again, this was in the record. These rates were born in the 1990s at a time when concert promoters were crying poverty. They were small promoters. They said, we're dying. You've got to give us a break. They got an extremely low rate. And to put this in context— I'm sorry. So all these things that we've said are benchmarks was basically charity on the part of BMI toward the concert promoters? That's why— The record established that they were rates agreed, that the concert promoters claimed poverty, and they prevailed in the negotiation, and those rates were not negotiated. Again, part of the evidence that was presented. And those rates continued. And then what does BMI or ASCAP do when they're faced with, okay, well, now we need to change? Then they face a user who says, well, you can't change it because you can't point to any other benchmark outside of BMI and ASCAP. Well, you can point to changes in the market if they're relevant to the rate setting, right? So how is this change relevant to the rate setting? Your Honor, the arguments that get made are that you can't tie these other changes to a specific change in the benchmark. So when you have a publisher rate, which has been used by this Court as a benchmark in DMX and by Judge Stanton in Pandora, then you have an outside rate in those contexts with 20 percent of the market aggregation that can be used to build up to a rate. And to put this in context, on a million-dollar gate, the performer gets $900,000. BMI, under this new rate of that million dollars, will get $5,000. How much does CSAC get? CSAC gets about $500. GMR gets about $500. Why is that comparable if they're getting $500 compared to $5,000? Why is that a comparable negotiation for the one that we have here? Your Honor, it's the best evidence we have of what the market shares. And there was evidence in the record that when NAFTA was negotiating with GMR and CSAC, they had in mind, oh, if we raise our rates with GMR and CSAC, that's going to be used by BMI and ASCAP, and it's going to influence the other rates. Everybody in this market knows that these various benchmarks will be used. But wouldn't the district court have to explain why it's weighting different rates? There are two questions, whether it's relevant at all, and then how much you should weight it in the comparison to historical benchmarks, right? So once we establish that it's relevant at all, then the next step, which is an issue of fact based on the expert testimony, then the next step is how to weight them. And on that, first, there's a range of benchmarks. Once there's a range of benchmarks, we would submit that the district court should have the latitude to establish a number within that range as the reasonable number. But here, there was evidence consistent with the way the question was articulated. I understand you weren't answering the question, Your Honor. But about the superiority of the GMR and CSAC benchmarks, that Judge Stanton was entitled to credit and did credit in adopting them as a benchmark. So you think he effectively gave them greater weight? I mean, he didn't say that. Yes, Your Honor, I do. And he didn't say that, but he set the rate towards the upper ed, which is clearly indicative of the fact that he placed greater weight on them. Well, no, he gave an explanation that had to do with being a miscontented industry and doesn't say anything about we think these benchmarks are superior for the following reasons. Isn't that a problem? Your Honor, I don't think so where there's sufficient evidence to justify the result. One, he endorsed Professor Tucker's testimony in adopting them as a benchmark. And Professor Tucker talked in her testimony about why these were superior benchmarks to the ASCAP benchmark, which is determined in the shadow of the rate court. But doesn't it seem strange to you that, in the hypothetical that you and I have been working on a little bit, that the district court adopted the rate that produced, the rate that the participant entitled himself to produced a smaller result than the larger result? Wouldn't the larger result be far more comparable? And I don't mean the dollar amount. I don't mean the $5,000. But it seems to me that your answer reflected that, GMR and ASCAP or whatever. Once we get into all these letters, it gets confusing. But the two smaller ones, the unregulated ones, drawing conclusions from their performance, given the size of them as compared to the size and the authority and the implications of the larger ones and the costs associated with the larger ones, don't the costs, they don't really seem comparable to me, 10 to 1. Your Honor, what winds up happening here is that those fees get allocated to the performers. Yeah, I understand that. I mean, the thing that's difficult, the thing that's so hard to get our hands on here, and Judge Robinson's been asking about it and Judge Venash has been, it's hard to get an appreciation of value. What's the value here? And you're talking about comparables and all these other things, but it's very hard to appreciate. I can understand why Taylor Swift's music on Pandora is worth a larger chunk of money than when she's performing with all the gizmos that go on. And some of my law clerks think her so terrific and everything. But trying to understand what the value of her music is in a particular performance at this theater in Las Vegas is really hard for me to wrap my hands around, other than what she's paid. But her songs that she creates have value, and under the copyright law, she's entitled to compensation. And because of all the complexities of the management of the copyright law, these BMI and ASCAP have emerged. And I understand why, and it all makes perfect sense. But understanding then the valuation process becomes very difficult. And it's hard for me to not see this BMI more like ASCAP than she or him. Well, there's no case in terms of market share we are more like ASCAP. The problem is that BMI and ASCAP rates are not the result of a willing buyer and a willing seller. But if you told me that I had $100,000 to spend out of my profits, and it's going to cost me $500 to get rid of the Eagles and their friends, but $5,000 to get rid of Taylor Swift and John Lennon and a few others, I'd spend it that way, wouldn't I? Well, what the evidence established was that the concert promoters want to have the entire spectrum of music available to them. Sure, so you want to cover the field. So they want to cover it at the field. And if they didn't have PROs to deal with, they would, by the same token, have to go to every publisher and or songwriter and get a license. If we are in a situation where smaller PROs can break off and get paid a higher value per point of market share, then why would anybody stick with the larger PROs? It makes no sense. I understand. And that's why Judge Stanton correctly found that it made sense to take the GMR and CSAC rates and adjust them based on market value, based on market share, so that effectively they're getting the same amount per performance that BMI and ASCAP are getting. You said a moment ago that the rates with BMI and ASCAP are not between a willing buyer and a willing seller. But they are negotiated rates, right? You're just saying they're not willing buyer and willing seller because of the shadow of the consensus. Well, no, I'm saying they are negotiated rates. But when BMI and ASCAP negotiate a rate with Canandaiga, Canandaiga already has the right to use the music. They can use the music for as long as they want. And BMI- Right, so it's a negotiated rate under the condition that BMI is not entitled to refuse a license. Right. So that's not a willing seller. And it's alternatives to go to court and incur the cost. It's alternatives to go to court and incur the cost. You're saying that the consent decree, by telling the rate court to set the rate, should think of the rate as the rate that would prevail if BMI had the right to walk away? Yes, that's the way it's been articulated, a willing buyer and a willing seller. That's the standard. The whole premise of the consent decree is that that is an unfair advantage. Well, Your Honor, you're reading something into the consent decree that's just not there. The consent decree only says, and by the way, the history here is BMI asked to be subject to a rate court provision. BMI did not ask and did not negotiate something in the consent decree that says this is to suppress prices. We negotiated for something that said a district court judge would be able to set a reasonable fee based on all of the evidence. All the arguments were available. This notion that BMI is an evil monopolist that is being constrained by this consent decree is categorically false. What we heard in evidence was that these concert promoters need the PROs, and they love having the PROs because they don't want to take the time to sign up individual songwriters. Can I ask about the revenue base? Yes. So what about the question that I had put to Mr. Gass? So we know that under competitive market conditions, two parties to agree to push in a contract, they have whatever fixed bargaining power they have. They're going to negotiate terms that maximize the size of the surplus that they're going to be splitting. They're not going to come up with terms that create a midway loss and reduce the size of the surplus so that they're achieving less. In this case, it seems like the change in the revenue base imposes an additional cost in calculating the revenue base where there's no corresponding increase in value. And you can capture the same value by just increasing the percentage you get of the ticket sales. So why isn't that just an economically irrational term of the contract? And that's a reason for thinking it's unreasonable. Okay, so first, one fact. Judge Stanton, when he expanded the revenue base, he did an adjustment to the rate that decreased the rate by the amount of the expansion. I understand. So if he's wrong about the revenue base, we'd have to send it back on the rate. So the rate would have to go up. I understand how they interact. But here's the problem. The promoters have an incentive to move revenue, and they've done this. There was evidence in the record that they've done this to move revenue from the face value of the ticket to the ticket servicing fee. I just have two questions about that. One is, you know, since you're getting, like, fractions of a percentage of the revenue, it doesn't seem like they're moving so much of the revenue and ticketing fees that they could avoid entirely. And even if they were, so couldn't you just recover that money by increasing the percentage of the ticket fees? Wouldn't that be the efficient way to address that problem? Well, we don't have, so one, I think that the- If we're imagining two parties who are negotiating a contract that's in their interest, wouldn't they say, okay, we think you're getting money from ticket fees and so on, but it would reduce the size of the surplus that we all get to split if we create a kind of administrative burden to calculate the revenue base, so give us a higher percentage of the ticket sales in order to compensate for that. Isn't that the way the negotiation would take place under regular market conditions? Your Honor, I don't think so, because if we give the other side the option to move revenue to ticket servicing fees and thereby decrease our fees, they have an incentive to do that. And that's what's happened. And the numbers- Did he make any findings that that's the reason he expanded the revenue base? He did not. He seems to think it was required by this music choice case, right? He didn't really say it's because of revenue shifting or the shell game or whatever it is that you- Well, I don't have complete memory of what's in the opinion on that point. But what I can tell you is the evidence was overwhelming. Like, the argument and the evidence were overwhelming about that being the reason, and that's the reason we're asking for it to be included, because otherwise it causes manipulation. And we saw it. There was evidence. So in the case of, like, VIP packages, there was evidence that some promoters were paying on VIP packages and some were not. So the reason for having the revenue base change there was just to make it clear, as opposed to just making it the option of some promoters to say they were reading the contract one way or another. But is it clear? I mean, there's this idea that most of the VIP packages are sold on an annual basis, that we buy them annually, and sometimes they're sold per concert. So, like, do we know even what VIP packages- So, again, we're getting into the weeds here and the facts. But VIP packages, no. The VIP packages, it was individual concerts. I think what- The VIP package only counts if it's a purchase of a VIP package on a one-off, but not if it's an annual purchase. If it was an annual purchase, I don't remember there being evidence about that. I think what Your Honor is referring to are box suites. Box suites. There was evidence that they claimed, they testified, that it was never done on a one-off. We had evidence that it was done on a one-off. And the way the rate quote is set up, it's limited to stuff that is specifically tied to a concert. So it would only pick up things. But doesn't that just invite more of the manipulation? You're saying it should not be part of the revenue base because they can shift it between annual and per concert, right? Your Honor, the standard here is whether the license that the court, after hearing all the evidence and having, I mean, we had days of testimony about these licensing issues, whether it's reasonable. And, you know, one could second guess what a court would establish as a contract. But I submit that's not for this Court here. The other question I put to Mr. Gass also about the revenue shifting. If, in fact, you had a contract where you're supposed to pay a certain percentage of ticket sales, and the counterparty starts shifting all of the profits from the concert to the ticketing fees as opposed to the actual ticket sales, wouldn't that be a violation of the covenant of good faith and fair dealing? Couldn't you sue them over that? Your Honor, I'm not going to rule out the fact that we can sue them for that. But that would be a very cumbersome lawsuit with all the issues that arise from implied covenant of good faith and fair dealing. And as counsel to clients, I never tell them to rely on an implied covenant of good faith and fair dealing when they can refer on something specific that makes the point. And that's what we wanted to do here. Can I ask, I want to go back to this Box Suite question, because I came away from your respective briefs thinking that maybe the sides had slightly different understandings about how this provision, as described by the district court, works in practice. So the order says Box Suite VIP package revenue is attributable to live concerts and paid to the promoter or a venue or artist with which the promoter has a contractual relationship. Construed broadly, that would say to me that if you could find a way to attribute the pro rata share of a particular concert's contribution to a venue's annual revenues for Box Suite, and if that venue has a contractual relationship with the promoter, which seems like by definition they would, that that's how you have to calculate the figure. But then the alternative argument that I think BMI would make is no, that's only applicable when the Box Suites are sold on a one-off basis for this particular- Our understanding is that it's specifically tied to a specific concert, and we're not making that additional argument on the Box Suites. So it's basically like really, really good, the difference between a front row seat and a back row seat. And basically, instead of sitting on the floor, the Eagles have a Box Suite that's available that goes for a huge price. We should get a percentage of that, too. So if the order were clarified to reflect that understanding, you wouldn't object? You wouldn't say, oh, we're entitled to more than that? Your Honor, if, yeah, if there's a lack of clarity in the opinion on that, but our understanding was it would be specifically tied to the concerts. Okay. Okay, thank you, Mr. Edelman. You've also reserved time for a moment of cross-appeal, so we'll hear from you again. But let's turn to Mr. Gass on the first rebuttal. Thank you, Your Honor. We appreciate the time that you've given us here. It's been a long morning. Let me hit four points as quickly as I can. First, on the revenue-based issue, I just want to clarify on the Box Suite issue. You need to get your stakeholders straight here. So customer pays venue for a Box Suite for the year. BMI is saying, most charitably here, the concert promoter should pay some allocable portion of that venue revenue allocated to, like, we don't know. That's not what they just said. They just said something very different from that. So they said only for a music show. So if the answer is, we don't care, they're not seeking to tax Box Suite revenue that is sold on an annual basis. They're only seeking to tax Box Suite revenue that is sold on a one-off basis for that show. I agree that's a very different position. I've never heard them say that before. That's what I thought I just heard. Even so, we still have a small issue, which is that the venue gets that money. The concert promoter doesn't get that money, so the concert promoter doesn't know what it is. On this ticketing fee issue, let me just reiterate again. You've got to understand who gets what money here. The artist is paid on what's called the show pot, which is the face value of all of the tickets sold. If it turned out the artist thought the promoter was shunting revenue that should go to the show pot into the ticket fees to avoid this point-whatever percent of revenue, first of all, the promoter would never do that. Second of all, the artist and their managers would never stand for it. That's on the revenue base. On the what question are we asking here, I want to make sure that the court is crystal clear about it. My law students get confused about this one, so let's get some consensus. There are two different potential questions you could be asking. One question is, if you didn't have the consent decree at all, what would happen? What rates would BMI be able to extract? That would be a stupid question for this court to be charged with answering, because it would subvert the whole purpose of what we are doing here. The actual question we are answering is, what is the rate that would emerge under conditions of effective competition as best we can approximate them? And the best we have to approximate them is the deals that emerge in this marketplace between BMI and ASCAP, because they know they have recourse to the rate court, not all of the time, but some of the time. And so that's why, historically, over and over again, this court has looked to those deals as valid benchmarks under this consent decree. I don't understand why that-I mean, those rates are completely-I understand why door number one doesn't make sense, given that we have a consent decree. I think my problem is I don't under-value in general is not something courts determine. It's something that markets determine. And so we're sort of in this fictional world where the court is supposed to figure out value, which is itself not something that's there. But to say what is the rate with effective competition, if one party to the negotiation consistently has two options, take the best that the other side seems to be willing to give in that negotiation, or go to court and spend a lot of money and a lot of time with a lot of uncertainty going back and forth, it strikes me that that is not a scenario that is reflective of a competitive market. And yet, over and over again, Your Honor, this court has looked precisely to the deals with BMI and ASCAP as a good, valid benchmark for precisely the question we're trying to answer for the other one here, right? I guess what you would also say, because courts have a difficult time determining value, the best they can do in this context is adhere to the historical negotiated rates and only depart if it's a very strong reason for doing so or a lot of evidence. Well said, Your Honor. Two more quick points. One, this question of what is comparable to what in the benchmark world, that is squarely a question of law. The Showtime opinion itself says that. That's 912 F-second at 571. And finally, Mr. Edelman talked about sort of the real-world consequences of all of this and what happens if, you know, BMI doesn't get the benefit of the GMR rates. It's worth asking what happens in the alternative, right? So if it turns out that GMR, which markets itself as a sort of premium supplier here, where they can deliver their stakeholders a premium over what they get with BMI, if this court says, actually, we should set the BMI rate at sort of an adjusted upward version of what the GMR rate is, is GMR going to say, great, that's fine? No. They're going to go back and they're going to say, all right, well, I need to double my rate now to get parity with where I was before. BMI is going to come back here and say, ah, our rate just doubled again. It's an upward spiral. With that, Your Honor, I appreciate all the time you've given this. Nothing further. Thank you very much, Mr. Gass. We'll turn to Mr. Edelman on the second rebuttal. I realize I didn't finish one of Judge Robinson's, responding to one of Judge Robinson's questions, and that is, why the .5? And on, first of all, I want to respond to the other music user rates. That was, again, the subject of expert testimony from Professor Tucker, who pointed out, and it was also the subject of testimony from Mr. Steinberg, BMI's lead witness, who negotiated the rates and explained why he felt it necessary to go to rate court. And what was established was that digital music had rates of 2.5 to 4.6, digital live concerts 2.5, radio 1.78, cable TV music .9. And where were the rates that were closer to the old BMI rates? Talk radio, .31, and sports events, .1375. And why is that surprising? I mean, the court sort of said this is a music-intensive industry, which felt sort of conclusory to me. If, in fact, the artists can perform their own music, the music for which they have licenses, independent of these blanket licenses anyway, then isn't the possibility of other music seeping in there sort of as incidental to their performance as, isn't it more comparable to talk radio and sports than streaming, where you're saying, yeah, we're going to play this stuff as a core part of our profit mission? Let me take a step back. So there are two rights that need to be purchased by any music user. The right to play a recording, or the right in live concert to have that person, that's one right. But you also need to pay the songwriter who has the copyright to the music. And oftentimes, the copyright holder is a songwriter who's different than the performer. And they don't, and the performers don't, who regularly perform. So the performers, they may have sold their copyright for the right to perform the music to a publisher. So there are different people who have different rights. But it would seem that that would be a fairly predictable and negotiable license. If you're worrying about protecting the performers for their core music that they're going to perform on the stage for the concert, unless somebody's, please do it, you've got to make sure you have stairway to heaven. I mean, you mostly know what they're going to play. Yeah, and so you would say, well, why can't the concert promoters just negotiate with them directly? And the answer is, because it's so cheap. It's so cheap to get these PRO licenses that they say when they're asked, it's administratively burdensome. We don't want to bother going out and figuring out what songs are going to get played. We can just get everything for basically almost for free. And that goes back to what happened in the 1990s. In the 1990s, we had the letters from the concert promoters over a period of years where they said, the industry is going bankrupt. We're going to lose everything. We can't afford the 1% rate that you want. And they got a super cheap rate that was not renegotiated until Mr. Steinberg took over the position and compared it to the other rates, knew what GMR and CSAC were getting, and said, we need a higher rate. .5% in the dynamic of this industry based on the entire record, including the economic evidence, including the history, and Judge Stanton also, in pointing at where in the benchmark range should be, he said the BMI historical rate should be a floor because of the history from the 1990s. So that's another basis where he's explaining why he would go towards the higher end. But this. Mr. Edelman, you can make a final statement, but we're over time. Okay. Thank you. Thanks. Thank you for the court's indulgence. Thank you very much, Mr. Edelman. The case is submitted.